IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

PETER LICHTE, JARROD BOWERS, and
DANIEL KELLY,

                Plaintiffs,

     v.

CITY OF WOODBURN, SCOTT
RUSSELL, JASON ALEXANDER, JOHN
MIKKOLA, MICHAEL HEREFORD, and
JOHN DOES 1-10,

                Defendants.

No. 6:14-cv-01521-AA
OPINION AND ORDER

AIKEN, Judge:

At the time this lawsuit was filed, plaintiffs Peter Lichte, Jarrod Bowers, and Daniel Kelly

were all police officers employed by defendant City of Woodburn ("the City"). Plaintiffs allege that

after they reported misconduct within the Woodburn Police Department, defendants (the City, former

Police Chief Scott Russell, former Police Captain Jason Alexander, former Police Sergeant John

Mikkola, and former Human Resources Director Michael Hereford) retaliated against them in

Page 1 - OPINION AND ORDER

violation of their rights under the United States Constitution and Oregon state whistleblower laws.

After discovery, defendants filed motions for summary judgment. For the reasons set forth below, defendant Mikkola's motion is granted in its entirety, and the remaining defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

This case centers on the employment relationship between plaintiffs and the Woodburn Police Department. Lichte became a Woodburn police officer in 2005. Bowers and Kelly joined the force three years later, in 2008. At the time Bowers and Kelly were hired, Mikkola was a police officer, Alexander was a sergeant, and Russell was Police Chief. Mikkola and Alexander were close friends, so close that Alexander's children called Mikkola "Uncle Johnny." Kelly Dep. 60:7-17. Mikkola and other officers were part of a group that self-identified as the "Memphis Mafia." Boiler Decl. Ex. 45.

In November 2008, a female Woodburn Police officer complained about her interactions with Mikkola and other male colleagues. Her complaints, which involved sexually inappropriate comments and other mistreatment, echoed the complaints of another female officer who had left the

---

[1] Because defendants moved for summary judgment, the facts are summarized in the light most favorable to plaintiffs. As such, there are many facts in this background section that are disputed by defendants. In summarizing the facts here, I make no credibility determinations and weigh evidence only to the extent necessary to determine whether there is a question of material fact regarding plaintiffs' claims.

I note that this background section contains only facts supported with evidence in the summary judgment record. Plaintiffs submitted a thirty-one page timeline purporting to summarize all relevant events. *See* Boiler Decl. Ex. 1. However, a substantial number of the line entries in that timeline — particularly the entries concerning events after this lawsuit was filed — contain no citation to the summary judgment record. Moreover, many entries appear to be unsupported by that record following this Court's independent review of the exhibits submitted by the parties. At this stage of the proceedings, I am unable to consider unsupported assertions.

department.

Before those complaints could be fully investigated, tragedy struck the Woodburn Police Department.  In December 2008, a bomb at a local bank took the life of one police officer and severely injured many others, including Russell, who lost his leg.  A series of "battlefield promotions" were necessary to fill the vacancies created by death and medical leave.  Two of those promotions went to Mikkola and Alexander, with Mikkola rising to sergeant and Alexander rising to captain.

In early 2009, Kelly was a probationary officer.  Mikkola, now a sergeant, began calling Kelly to be his designated driver.  Kelly states he felt compelled to say yes to those requests because of his probationary status and Mikkola's rank.  One night, Mikkola insisted that Kelly and his girlfriend spend the night Mikkola's house.  Mikkola entered a bedroom where Kelly and his girlfriend were having sex.  Mikkola then pulled down his pants, jumped on the bed, and put his penis near Kelly's girlfriend's face.  After Kelly and his girlfriend stopped having sex, Mikkola left the room.  Kelly says that although he was troubled by the incident at the time, he did not report it immediately because he knew as a probationary officer he could be fired for any reason.  Over the next several months, several additional incidents caused Kelly to be concerned about Mikkola's judgment and behavior: Mikkola ordered Kelly to handcuff an overweight suspect to the cage in the patrol car (an unsafe practice for suspects), got out of the car to yell at an individual following a domestic disturbance call, and was verbally abusive to a woman in a bar who did not reciprocate his off-duty advances.

Meanwhile, Lichte had been watching Mikkola with concern.  After Lichte heard about the incident between Mikkola and Kelly's girlfriend, Lichte approached Kelly to learn what happened.

Page 3 - OPINION AND ORDER

Kelly reported the incident to Lichte, who was the Officer In Charge. Lichte, in turn, reported his concerns about Mikkola, including the incident with Kelly and Kelly's girlfriend, to Sergeant Jason Telusty. The meeting took place off the clock at Telusty's home.

Telusty reported Lichte's concerns up the chain of command to Captain Charles Blevins. Blevins assigned Alexander to investigate the complaints. Alexander's assignment raised concerns for Telusty, who advised Blevins to assign the investigation to someone else in view of Alexander's and Mikkola's close relationship. Kelly first learned of Alexander's role in the investigation when Alexander asked Kelly why Lichte was "interested in [Kelly's] sex life." Kelly Dep. 53:7-11. Alexander told Kelly it would be better if he spoke to Mikkola directly about any problems. Soon after that conversation, Mikkola confronted Kelly in a church parking lot. He told Kelly he had no business discussing Mikkola's off-duty behavior, and threatened that Kelly would be subjected to an internal affairs investigation for failing to follow chain of command when he reported the incident to Lichte.

In late April 2009, while Alexander's investigation was ongoing, a suspect was injured while he was being placed in a patrol car. The suspect stated he had been punched by the arresting officer. Both Kelly and Lichte were at the scene. Alexander, who was also present, told officers on the scene not to let Kelly or Lichte near the suspect. The suspect was released without citation and his injuries were not documented. At the debrief after the incident, Lichte raised questions about what had happened. After Mikkola tried to shut down any inquiry, Lichte requested that the Oregon State Police be brought in to investigate. That investigation concluded there was insufficient evidence to support bringing criminal charges against any officer.

In May 2009, Lichte was removed from this Officer In Charge duties for starting an

unauthorized investigation of Mikkola. At that point, Lichte retained Jeffrey Boiler, who remains his attorney in this matter.

On May 26, 2009, on Alexander's recommendation, Officer Lichte received his first notice that internal affairs ("IA") was investigating him. The notice alleged Lichte violated five policies in launching his own investigation of Mikkola: loyalty, general conduct, chain of command, unbecoming conduct, and internal investigations procedure. During Lichte's interview as part of the IA investigation, the City's recording device malfunctioned. Lichte's attorney also recorded the interview. The City directed Lichte to turn over a copy of the recording without specifying a timeframe. When Lichte failed to produce a copy within nine days, the City gave him twenty-four hours to produce the recording, which was still in the attorney's possession. Lichte, who was not working the day the City issued the twenty-four hour order, did not produce the recording in the allotted timeframe. He was charged with insubordination and a second IA investigation was opened.

Lichte's first IA investigation resulted in a sustained finding of fact that he violated departmental policy by investigating Mikkola. When Russell returned from medical leave, however, he met with Lichte and agreed to purge both IA's from Lichte's file.

As part of his official investigation into the complaints against Mikkola, Alexander interviewed a series of people, including Kelly, Kelly's then-girlfriend, and Lichte. There are holes in the evidentiary record of the investigation: the interview with Kelly's then-girlfriend includes four minutes of audio during which only Alexander's voice can be heard, and Alexander's memo closing the investigation is unsigned and undated, contrary to department policy. However, Kelly and Kelly's then-girlfriend, who was also trying to become a police officer in 2009, agree they minimized the incident in their conversations with Alexander because they feared telling the truth could

jeopardize their careers.

In July 2009, Alexander and another sergeant searched Lichte's personal and work property without notifying him. Lichte filed a grievance through the union, asserting such a search violated his rights under the collective bargaining agreement. Alexander admitted the search took place but stated he was unaware they were violating any policy by conducting it.

In January 2010, Mikkola began rejecting Kelly's police reports. In December 2010, Mikkola's then-girlfriend, a dispatcher, made a complaint to Telusty about Kelly's handling of various calls. In January 2011, Mikkola refused to cover Kelly while Kelly handcuffed a suspect despite Kelly requesting cover several times. Concerned about his safety, Kelly reported the incident to Telusty and to the union vice president, Officer Juan Miguel Araiza.

Lichte and Kelly were not the only ones with concerns about Mikkola and Alexander. Telusty stated that he delayed his retirement to "keep the wolves away from the door" and protect Lichte and Kelly from retaliation. Telusty Dep. 62:2-12. Araiza tesified that Mikkola and Alexander were verbally abusive to staff, violated departmental policy without consequences, permitted their friends to violate departmental policy, held grudges, and retaliated against officers for personal reasons. A December 2011 letter drafted by the union's attorney stated that police officers who came forward with concerns or complaints "found themselves the subject of baseless Department investigations, often at the behest of Sgt. Mikkola[.]" Boiler Decl. Ex. 44.

In October 2011, the union unanimously voted to go to the Mayor and City Manager with their concerns about Mikkola's conduct and the department's apparent unwillingness to do anything

about it.[2]  In November 2011, Mikkola was placed on administrative leave.  That same month, Hereford was hired as Human Resources Director.  Mikkola never returned to work with the Woodburn Police Department and medically retired in 2014.

In May 2012, Bowers joined a special gang task force.  The task force was composed of officers from a variety of local departments and headed by the Federal Bureau of Investigation. Bowers was told early on in his time on the task force that if they did not find a confidential informant and make a buy happen, the task force funding would end.  In August 2012, Bowers played a key role in convincing a woman with access to one of the task force's primary targets to act as a confidential informant.  Bowers assumed the woman would be signed up as a task force informant through the federal government.  Instead, Sergeant Jason Millican told Bowers the woman would be signed up as an informant through the Woodburn Police Department.  The task force planned a buy using the confidential informant for the next day.  The day of the buy, Millican, on orders from Alexander, told Bowers he could not use the informant to make the buy.  Bowers characterized this move as "railroad[ing]" the investigation. Bowers Dep. 66:15.  Bowers stated the failure to move the buy forward effectively "ended our task force." Bowers Dep. 66:10.  Another member of the task force, an officer from the Canby Police Department, objected to the informant being enrolled through Woodburn and stated the inability to do the controlled buy "impaired" the investigation of the task force.  Smith Dep. 15:8.  He also testified that Alexander contacted the Canby Police Department in an attempt to get him disciplined for criticizing the Woodburn Police

---

[2] The record contains evidence of numerous other allegations regarding Mikkola, including complaints about his conduct after he left his position with the Woodburn Police Department.  Those allegations are addressed where they are relevant in the Discussion section of this opinion.

Department's decision.

In September 2012, Bowers was the lead investigator on a case involving a sexual predator who had taken pinhole photos of a woman and her young child. He asked his supervisor, Sergeant Wilson, to conduct a victim interview as a part of that investigation. The victim later angrily told Bowers she had been subjected to a "perverted interview" during which she sat in a room full of detectives while several officers flipped through the nude photos the perpetrator had taken of her. Bowers Dep. 113:4. Furious, Bowers confronted Wilson; he told Wilson if he ever had to "apologize to one of my victims again" he would go around the chain of command and go straight to the Oregon Department of Justice. Bowers Dep. 115:12-13. Wilson responded to this confrontation by following Bowers around with a tape recorder at work. When Bowers questioned him about this behavior, Wilson explained he was writing a book.

In March 2013, the informant who had been pulled from the task force controlled buy reported that she had been raped. Approximately one week after the alleged rape, the informant called the police to request an area check because she thought she heard someone outside. The responding officers discovered an illegal short barreled shotgun in her home and arrested her. When Bowers heard about the arrest, he was angry and considered it an inappropriate way to handle a rape victim's misguided attempt to protect herself. The alleged perpetrator, Mickey Henson, was arrested and indicted on rape charges, but was acquitted at trial.

Bowers received notice that an IA investigation had been opened regarding disparaging remarks he had made to an assistant district attorney regarding the informant's arrest. While that investigation was pending, Bowers submitted paperwork to request time off to move his family. He took the time off before receiving formal approval, a practice he asserts never had been a problem

in the past. A second IA investigation was opened regarding that violation of departmental leave policy. Shortly thereafter, a third IA investigation was opened after Bowers canceled a meeting with an assistant United States attorney. Bowers received sustained findings of fact in all three investigations. He was given a verbal warning for the attendance violation. For the other two violations, he was suspended for three days without pay and taken off the detective rotation fifteen days early, resulting in a two-week demotion and pay reduction.[3]

In June 2013, Lichte and Kelly made hostile work environment complaints to Captain Doug Garrett. They asserted that even after Mikkola went on leave, Alexander continued to create a hostile and retaliatory work environment, for example by showing up when Lichte was working even when there are plenty of other officers present. Captain Garrett discussed the complaints with Russell, who asked Hereford to open an investigation. Hereford asked to have an outside entity perform the investigation, but that request was denied. Russell directed Alexander to take no supervisory action against Lichte or Kelly while the investigation is pending.

The day before Lichte's scheduled interview with Hereford, Lichte found a methamphetamine pipe in his patrol car. Araiza had the car immediately before Lichte and says he made no arrests. Lichte believes the pipe was planted as a warning.

In September 2013, Kelly reported Sergeant Keith Kimberlin for time theft (going home while he was still on the clock.) The department took no action against Kimberlin, and Kelly was transferred to work on Kimberlin's team.

---

[3] Because the Woodburn Police Department is small, the officers rotate on and off working as detectives. When they work as detectives, they are paid more. Accordingly, being moved off the detective rotation ahead of schedule results in a short-term demotion and pay reduction.

After conducting ten interviews and listening to Alexander's three recorded interviews from 2009, Hereford returned his report on Lichte's and Kelly's hostile work environment complaints, concluding they were unfounded. The report came in two forms: a three-paragraph version delivered to Derrickson, and a fifteen-page version delivered to Russell. Neither report was given to Lichte or Kelly.

In October 2013, a new IA investigation was opened against Lichte regarding follow-up to get a warrant issued in a rape case. In January 2014, Henson — the individual acquitted in the rape of the informant — blocked Kelly's patrol car and threatened him, telling Kelly he had "his sights set on someone." Kelly Dep. 195:3. Kelly reported the incident up the chain of command, but no action was taken. Henson and Mikkola know one another; after his deposition, Mikkola posted a photo of Elvis Presley superimposed with the words "Memphis Mafia" as his Facebook profile picture. Henson commented "Looking good John." Boiler Decl. Ex. 45.

In February 2014, Kelly was notified of a potential "*Brady* problem." The issue involved inconsistent statements made regarding the 2009 incident between Mikkola, Kelly, and Kelly's girlfriend. When Alexander interviewed Kelly in 2009, Kelly minimized the incident, describing it as awkward but noting that nobody was forced to do anything against his or her will. During his 2013 interview with Hereford, Kelly characterized the encounter as an attempted sexual assault. The Woodburn Police Department turned the two statements over to the district attorney's office to determine if the statements had impeachment value such that they must be turned over to the defense in any case in which Kelly would testify. Kelly was placed on paid administrative leave. In April 2014, a state court judge ruled the material had impeachment value and must be turned over to the defense. The district attorney's office designated Kelly a "*Brady* level two," meaning they would

Page 10 - OPINION AND ORDER

continue to use him as a witness. In June 2014, Kelly was permitted to return to work.

In September 2014, plaintiffs filed this action in federal court. Plaintiffs invited the union to join in the litigation. The union declined, but reiterated its serious concerns about retaliation inside the department.

At some point, apparently on their attorney's advice, Lichte and Kelly began recording all work conversations using personal recording devices. They informed other participants in the conversation they would be recording and declared themselves whistleblowers. Defendants learned about the existence of the recordings through discovery in this lawsuit. Because all documents exchanged in discovery in this case are subject to a protective order, defendants sought an order from this Court declaring that the recordings fell outside the scope of the order. Plaintiffs opposed defendants' motion, arguing the recordings would be used to support further retaliation. On November 10, 2015, this Court held the recordings were not the type of information the parties intended to keep confidential through the protective order. *See* Doc. 29 ("In reaching this decision, this Court neither sanctions nor disapproves defendants' purpose in seeking to use the recordings outside this litigation. Defendants' motives simply have no bearing on whether the recordings are the sort of information the parties intended to protect through their stipulation.")

After defendants obtained copies of the recordings, the City opened IA investigations against Kelly and Lichte for violation of departmental policy regarding recording conversations. Lichte and Kelly were represented by a union attorney during the process. The union attorney argued repeatedly that disciplining Lichte and Kelly for making the recordings was retaliatory and violated their rights as whistleblowers under state law. The union attorney also contended that the department had changed its policy on recording conversations recently and in direct response to Lichte and Kelly

filing the federal lawsuit.  Russell responded that the policy change was part of a batch of
prescheduled changes and that any relationship to this lawsuit was purely coincidental.

The new Chief of Police, James Ferraris, told Lichte and Kelly that ordinarily, violation of
the policy on recording conversations would not justify termination.  However, Ferraris stated that
he would be forced to proceed with termination unless Lichte and Kelly would promise to obey
departmental policies in the future, including those governing recording conversations.  Lichte and
Kelly refused.  In June 2016, Lichte and Kelly were fired.  In letters addressing Lichte's and Kelly's
union grievance regarding their termination, Chief Ferraris wrote that he

> Tried everything [he] could think of to prompt to you make a commitment that could
> have saved your job . . . .  In a very real sense, you made the decision that resulted in
> termination of your employment. . . .  I cannot run a police department effectively if
> employees are allowed to decide for themselves which policies they will or will not
> follow.

Boiler Decl. Ex. 36 & 37.

At his deposition, Lichte testified that his initial reports about Mikkola's misconduct set off
a series of IA investigations that essentially ended his career.  He contends Hereford's investigation
of the 2013 hostile work environment complaint was a "sham" and a "hatchet job" rather than the
thorough investigation warranted by the seriousness of the allegations. Lichte Dep. 93:18-22. Kelly
explained he was unwilling to say he would stop recording conversations because there was nobody
he trusted in the command structure and without the recordings, command would be able to "twist
the truth." Kelly Dep. 145:4.

Bowers continues to work as a Woodburn police officer and reports that things are going
well.  Nonetheless, he asserts that after the problems with the drug task force informant and the
sexual predator victim interview, "Jason Alexander and Nick Wilson and Scott Russell . . . came

Page 12 - OPINION AND ORDER

after me with policy violation after policy violation" over "trivial things."  Bowers Dep. 76:9-24.

He further testified that the police department is rife with policies, procedures, and tactics that are

unethical, illegal, and immoral; that officers are abused by a "renegade group"; and that unsupported

rumors are used to control people.  Bowers Dep. 93:9-22, 94:5-15.  According to Bowers, the

Memphis Mafia "pretty much ran roughshod over everybody in the police department."  Bowers

Dep. 107:5-23.  "If you cross anybody in the Memphis Mafia, your career is going to be ended.  If

you try to report any misconduct, your career is going to be ended.  They will retaliate and come after

you with policy violations, and they will spread rumors about you."  Bowers Dep. 109:2-18.

Defendants now move for summary judgment on all claims.  They contend many of

plaintiffs' claims are time-barred or fail as a matter of law.  For the remaining claims, defendants

assert plaintiffs have failed to show they could prevail at trial.

## STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has

the burden of establishing the absence of a genuine issue of material fact.  *Id.*; *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of

material fact, the nonmoving party must go beyond the pleadings and identify facts which show a

genuine issue for trial.  *Id.* at 324.  "Summary judgment is inappropriate if reasonable jurors, drawing

all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's

favor."  *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

I.    *Claims Against Mikkola and the John Doe Defendants*

Defendant Mikkola moves separately for summary judgment. He argues that any claims against him are time-barred because he has not had any active role at the Woodburn Police Department since going on administrative leave more than two years before this lawsuit was filed.

All claims against Mikkola are asserted under section 1983. Section 1983 claims filed in this Court are subject to the two-year Oregon limitations period for personal injury actions. *Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2002). Plaintiffs filed this lawsuit September 23, 2014. To be timely, therefore, their section 1983 claims must have accrued on or after September 23, 2012. It is undisputed that Mikkola went on administrative leave in November 2011 and did not perform any official duties as a police officer between that date and his medical retirement in 2014. *See* Kelly Dep. 206:18-22 (acknowledging that all actions for which Mikkola is being sued took place prior to November 2011); Lichte Dep. 18:17-23 (conceding that Mikkola neither supervised Lichte nor worked in any official capacity at the Woodburn Police Department after November 2011). In other words, Mikkola had no official role at the Woodburn Police Department during the two years when plaintiffs' timely claims could have accrued.

Plaintiffs advance two arguments in response to Mikkola's motion. First, they assert that Mikkola continued to influence policymaking behind the scenes even after his retirement. Lichte stated in his deposition that he was told Sergeant Millican was in "almost daily contact" with Mikkola even after Mikkola left the department. Lichte Dep. 243:16. Bowers testified that he heard from another police officer that Mikkola's vehicle was seen parked at the police department while Mikkola was on leave. Bowers Dep. 150:21-25. A police officer from another city also reported

Mikkola sent him abusive text messages referring to Lichte and Kelly as recently as 2015. Nelson Dep. 12:23-13:7.

That evidence is insufficient to show that Mikkola was personally involved in violating plaintiffs' constitutional rights after November 2011. *See Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) ("Liability under [section] 1983 must be based on the personal involvement of the defendant."). Plaintiffs have introduced evidence to support the conclusion Mikkola stayed in contact with Woodburn police officers after he went on medical leave, but no evidence showing he retained any decisionmaking authority while on leave. And although the text messages show Mikkola remained angry at Kelly and Lichte after this lawsuit was filed, there is no evidence he acted under color of state law when he sent those messages. *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (holding that a former government employee's post-retirement conduct "isn't attributable to the state and can't form the basis of a section 1983 claim" absent evidence the retired employee "jointly engaged with state officials in his conduct").

Second, plaintiffs argue that their claims against Mikkola are not time-barred because the claims are asserted under the continuing violations doctrine. That doctrine acknowledges that sometimes, an unlawful employment practice "occurs over a series of days or perhaps years" and that any discrete "act" of harassment in "may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).[4] "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for

---

[4] *National Railroad Passenger Corp.* addressed the continuing violations doctrine in the context of claims brought under Title VII of the Civil Rights Act. The Ninth Circuit applies the continuing violations doctrine to section 1983 actions. *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001).

the purposes of determining liability." *Id.* at 117.  The continuing violations doctrine cannot save

the claims against Mikkola because *all* Mikkola's allegedly retaliatory conduct as a state actor took

place outside the limitations period.  Mikkola is entitled to summary judgment in his favor on all

claims.

All claims against the John Doe defendants also must be dismissed because discovery has

closed and plaintiffs have not moved amend the complaint to name any additional defendants.  *See*

*Jakeman v. Berry*, 2015 WL 2062344, *1 n.1 (D. Or Apr. 6, 2015); *Ouma v. Clackamas Cnty.*, 2014

WL 1874051, *2 (D. Or. May 7, 2014).

II.    *Federal Claims*

A.    *First Amendment: Free Speech*

Defendants advance numerous arguments regarding plaintiffs' free speech claims.  I first

consider defendants' arguments regarding facts not pleaded in the complaint.  I then turn to the

merits of plaintiffs' First Amendment claims.

1.    *Unpleaded Facts*

In federal court, the governing standard is notice pleading.  The question is whether the

complaint contains enough factual detail to give the defendant "sufficient notice of the basis for a

claim for relief."  *Hayden v. United States*, 147 F. Supp. 3d 1125, 1130 (D. Or. 2015).  Because the

motion before this Court is a motion for summary judgment following discovery, the summary

judgment record informs my consideration of defendants' challenge to the pleadings to the extent

it shows that defendants were on notice of the claims against them.

Defendants make two independent arguments regarding unpleaded facts.  First, defendants

assert that the complaint does not contain any allegation that Bowers engaged in protected speech.

It is true that the complaint does not cite any particular example of protected speech with respect to Bowers. It does, however, broadly state that the City had a "policy and practice" of utilizing broadly worded departmental rules "to retaliate against any employee . . . who raised issues of fact which could leave to the discovery of . . . unlawful conduct." Compl. ¶ 13. The complaint goes on to allege that the policy "in turned resulted in systemic abuse . . . of the disciplinary process" to "selectively justify discipline and dismissal of police officers . . . including without limitation Plaintiffs, for protected speech within the meaning of the Oregon Whistleblower Law." *Id.* The same paragraph concludes by listing "activity being protected by this abuse" including "misuse of intimate photographs of female victims." *Id.*

In view of the summary judgment record, it is clear the reference to intimate photographs of female victims refers (in part) to the incident involving the victim interview in Bowers's sexual predator case. It is clear defendants were on notice regarding that incident, because they questioned Bowers about it at length during his deposition. The complaint adequately alleges that Bowers engaged in protected speech.

Defendants' second argument regarding unpleaded facts relates to the fact that Lichte and Kelly were fired after this lawsuit was filed. Defendants argue that because the complaint does not allege that Lichte and Kelly were fired, their termination cannot be considered in analyzing the motion for summary judgment. Plaintiffs respond that the termination was the culmination of the long pattern of retaliatory conduct at the heart of the complaint and need not be pleaded to be considered on summary judgment.

Defendants cite *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963 (9th Cir. 2006), in support of their argument that plaintiffs' failure to plead a fact bars a court from considering that fact

on summary judgment. In *Pickern*, the plaintiff alleged the defendants had violated the Americans with Disabilities Act by failing to remove architectural barriers. *Id.* at 965. The complaint included "long lists of possible architectural barriers," but did not "actually allege that any of these specific barriers existed." *Id.* Instead, the complaint stated that the defendants' failure to remove architectural barriers "may include, but is not limited to" the listed examples. *Id.* After the close of discovery and in response to defendants' motion for summary judgment, the plaintiff identified specific accessibility violations related to the slope of ramps, cross-slope of sidewalks, emergency fire exits, and emergency landings. *Id.* at 966. None of those examples had been listed in the complaint. The court held the plaintiff could not raise new, unpleaded violations of the law after discovery had closed because the defendant had not been on notice of the claims against it. *See id.* at 969 ("Providing a list of hypothetical possible barriers is not a substitute for investigating and alleging the grounds for a claim.").

Pickern is distinguishable. In *Pickern*, the violations existed when the complaint was filed; the plaintiff had simply failed to sufficiently investigate and articulate those violations. Here, by contrast, plaintiffs did not plead termination as an adverse employment action because when they filed the complaint, Lichte and Kelly hadn't been fired yet. No amount of investigation would have enabled them to plead facts that had not yet occurred.

At bottom, this dispute is over the extent to which the complaint limits the summary judgment inquiry. In *Coleman v. Quaker Oats*, 232 F.3d 1271, 1291 (9th Cir. 2002), the Ninth Circuit had to decide whether the plaintiff could prove employment discrimination using evidence of disparate impact even though no disparate-impact theory was pleaded in the complaint. The complaint alleged disparate treatment (intentional discrimination) but did not mention disparate

impact. *Id.* The court held the plaintiff could not proceed with this unpleaded theory of liability. *Id.* at 1292. Because different evidence is required to prove disparate treatment and disparate impact, it would prejudice the defendant employer to permit the plaintiff to proceed with both theories when only one was pleaded. *Id.*

In deciding whether to consider plaintiffs' termination, therefore, I must determine whether plaintiffs are attempting to assert an unpleaded legal theory that would require them to face "different burdens and defenses." *Id.* I conclude they are not. Plaintiffs allege defendants took a series of retaliatory actions against them in order to prevent them from speaking out about other police officers' misconduct. Termination is by far the most severe adverse action in the record, but that difference of degree does not transform termination into a new legal theory. Rather, termination is a new fact supporting the already-pleaded claim of free speech retaliation.[5]

Even though termination is not a new legal theory, it would be inappropriate to consider it in connection with plaintiffs' claims if defendants did not have the opportunity to explore termination in discovery. *See, e.g., Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1082-83 (E.D. Cal. 2010) (plaintiff could not assert a free speech claim neither pleaded in the complaint nor raised during discovery because it would "blind side" the defendant). The question is whether defendants were on notice that termination would be at issue. Kelly was deposed on August 4, 2015. Lichte was

---

[5] The Ninth Circuit has held that "the continuing violations doctrine does not apply to employee termination cases." *Grimes v. City & Cnty. of San Francisco*, 951 F.2d 236, 238 (9th Cir. 1991). That holding refers to statute of limitations rules and does not mean that continuing violations and termination are two separate legal theories in the same way that disparate treatment and disparate impact are two separate legal theories. *Grimes* stands for the proposition that termination cannot render an earlier series of continuing-violation actions timely; the continuing violation must be timely on its own.

deposed on August 5, 2015.  Termination was not addressed in either deposition because Kelly and Lichte were not fired until nearly a year later, in June 2016.

This does not end the inquiry, however.  It cannot be the case that a fact can never be raised in litigation if it is not addressed in a deposition.  Otherwise, public employers could always avoid liability by waiting until after deposing an employee before firing him.  Here, there is ample evidence in the summary judgment record that defendants knew plaintiffs considered termination for recording conversation further retaliation.  Plaintiffs opposed defendants' motion regarding the scope of the protective order on the ground that defendants intended to use the recordings to punish plaintiffs. *See* Pls.' Resp. to Def. City's Disc. Mot. 5 (doc. 26) ("[I]t affirmatively appears the Defendant City's police managers fully intend to punish Plaintiffs for the mere act of making a claim in Court, alleging retaliation as the basis.")  Throughout the process leading up to Lichte's and Kelly's terminations, plaintiffs' union lawyer informed defendants many times that termination would be retaliatory and in violation of plaintiffs' rights as whistleblowers.  Discovery closed August 15, 2016, leaving defendants more than sixty days to ask to redepose plaintiffs on the issue of termination.  They made no such motion.  Even though plaintiffs did not plead termination, I will consider it as I assess whether their speech retaliation claims can survive summary judgment.

This is an unsettled area of the law.  The best practice would have been to request leave to file a supplemental pleading under Federal Rule of Civil Procedure 15(d), which permits a court, "[o]n motion and reasonable notice" to "permit a party to serve a party setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  The Court will entertain a motion to file a supplemental pleading should plaintiffs choose to submit one.

2.    *Merits of Speech Retaliation Claims*

The Ninth Circuit has established "a sequential five-step inquiry" for analyzing the merits

of a public employee's speech retaliation claim. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954,

961 (9th Cir. 2011) (quotation marks omitted). The court must determine

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff
> spoke as a private citizen or public employee; (3) whether the plaintiff's protected
> speech was a substantial or motivating factor in the adverse employment action; (4)
> whether the state had an adequate justification for treating the employee differently
> from other members of the general public; and (5) whether the state would have
> taken the adverse employment action even absent the protected speech.

*Id.* (citing *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).

As a threshold matter, I must determine which speech and adverse employment actions are

at issue. For Lichte, there are three relevant reports: his initial report about about Mikkola's behavior

in 2009, his request that the Oregon State Police investigate the incident involving the suspect who

was injured in 2009, and the hostile work environment complaint filed in 2013. For Kelly, the

relevant speech is his 2009 report to Lichte about Mikkola and his 2013 hostile work environment

complaint. For Bowers, the relevant speech is the confrontation with Sergeant Wilson and threat to

go to the DOJ.[6]

In the retaliation context, an adverse action is any action "that a reasonable employee would

have found . . . materially adverse" such that "it well might have dissuaded him from engaging in

---

[6] Although Bowers never followed through on that threat, the Ninth Circuit sees "no legal
distinction to be made between the filing of a charge which is clearly protected and threatening to
file a charge." *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.*, 685 F.2d 1149, 1156 n.3 (9th
Cir. 1982) (citation omitted); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d
Cir. 2005) (relying on *Gifford* to hold that planning to testify in a colleague's Title VII
discrimination suit is protected activity).

a protected activity." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (quotation marks omitted). The clearest adverse actions here are Kelly's termination, Lichte's termination, and Bowers's suspension/demotion.

I note, however, that even without Lichte's and Kelly's termination, there are sufficient facts in the summary judgment record to permit them to proceed on a continuing-violations theory. Viewed in the light most favorable to the plaintiffs, the summary judgment record contains evidence of the following within the two-year statute of limitations before the complaint was filed: Alexander showed up on Lichte's police calls even when there was plenty of coverage; Kelly was threatened by an individual who was acquitted of the rape of the confidential informant and who has ties to Mikkola, but nobody investigated that threat after Kelly reported it; defendants initiated a *Brady* investigation with the district attorney's office in retaliation for Kelly's hostile work environment complaint; drug paraphernalia was planted in Lichte's car the day before his interview with human resources regarding his hostile work environment complaint; and a baseless internal affairs investigation was launched against Lichte regarding the way he handled a rape case.[7] When considered together with the internal affairs investigations and other incidents that occurred more than two years before this lawsuit was filed, these are precisely the sort of "minor" retaliations that may be actionable under the continuing-violations doctrine even though none of them would qualify as an adverse employment action standing alone.

I now turn to the Ninth Circuit's five-step inquiry. I first must determine whether plaintiffs

---

[7] Plaintiffs' timeline contains a number of other allegations, most notably that plaintiffs' schedules were changed in retaliation for their complaints. Because those timeline entries include no citation to the summary judgment record and appear unsupported by any evidence in that record, I cannot consider them in analyzing defendants' motion.

spoke on a matter of public concern. "Speech involves a matter of public concern when it can be fairly considered to relate to any matter of political, social, or other concern to the community." *Eng*, 552 F.3d at 1070 (citations and quotation marks omitted). By contrast, employee speech generally is not protected when it deals with "individual personnel disputes and grievances . . . that would be of no relevance to the public's evaluation of the performance of governmental agencies." *Id.* (citations and quotation marks omitted). Whether speech was on a matter of public concern depends on the content, form, and context of speech in light of the entire record. *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991). Content is the most important of these considerations; although a court should consider whether a plaintiff was motivated by a personal grudge in making a report, "motive should not be used as a litmus test for public concern." *Id.* (quoting *Berg v. Hunter*, 854 F.2d 238, 243 (7th Cir. 1988). Speech that exposes potential government misconduct or relates to the need to respond to that misconduct may be speech on a matter of public concern. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1069 (9th Cir. 2012); *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009).

All of the speech at issue here plainly was on matters of public concern. The speech did not merely concern internal personnel matters such as the way plaintiffs were treated by colleagues and supervisors. Lichte's and Kelly's initial reports and Lichte's request for an Oregon State Police investigation involved their concerns about Mikkola's and Alexander's conduct on and off the job, including treatment of suspects and civilians. Those matters are of great concern to the community. Bowers's threat to go to the DOJ related to an interaction between police officers and a victim in a sex crime — again, an issue not about internal departmental disputes but about the relationship between police officers and the community. Finally, Lichte's and Kelly's hostile work environment

claim alleged systemic use of departmental policy to silence and punish officers who attempted to uncover police department misconduct or abuse of power; they assert they have paid for years for attempting to bring Mikkola's conduct to light.

All three plaintiffs also spoke as private citizens rather than as public employees. Lichte's and Kelly's 2009 reports are the closest call on this question. Kelly appears to have reported Mikkola's behavior only after he was questioned by Lichte, an officer who outranked him. And Lichte discreetly reported Mikkola's actions up the chain of command. But even assuming Lichte's and Kelly's initial reports were made in the course of their duties as police officers, the hostile work environment complaints, the request for an Oregon State Police investigation, and Bowers's threat to go to the DOJ clearly were made in plaintiffs' capacities as private citizens.

Moving on to the third factor, causation is easily satisfied with respect to Bowers. There is a close temporal relationship between his protected speech and the adverse actions that followed. For Lichte and Kelly, causation is a closer call. In the absence of direct evidence of discrimination, timing is typically a key consideration in assessing whether a retaliation claim can survive summary judgment. Here, there is a large hole in the timeline. Lichte and Kelly made their initial reports in 2009, and defendants allegedly retaliated against them in the form of several internal affairs investigations. Once those investigations concluded, however, there is a relatively quiet period (roughly November 2011 to June 2013) during which all alleged retaliaton appears to have been quite minor. The problems then appear to resume in June 2013 with the hostile work environment claims, this lawsuit, and discovery of the recordings.

Defendants argue this gap in the timeline requires the Court to treat the two sets of events separately. Essentially, defendants argue each internal affairs investigation should be isolated and

connected only to the facts that immediately preceded it.  Such hermetic sealing is unwarranted.  It is clear from the complaint and from the response to the motion for summary judgment that Lichte and Kelly contend all the events, from 2009 to the present, are connected.  They contend they reported Mikkola's conduct in 2009 and have been subject to a long series of retaliations ever since. The gap in the timeline undermines this contention, and tends to support defendants' contention that plaintiffs are simply trying to redress stale workplace grievances through renewing complaints about an officer who no longer works for the City.  Ultimately, however, Lichte and Kelly have presented enough evidence to take their argument to trial.  It will be up to the jury to determine whether the gap in time (and changes in departmental leadership in the interim) breaks any causal chain between the earlier and later sets of events.

The fourth and fifth considerations, whether defendants had adequate justification to treat police department employees differently from members of the general public and whether defendants would have taken the adverse employment action absent the protected speech, can be considered together.  Plaintiffs do not challenge the policies under which they were disciplined on their face. Instead, they assert the department selectively enforces those policies in order to punish police officers who speak out.  If that is true, defendants neither had adequate justification for limiting plaintiffs' speech nor would have imposed the adverse actions in the absence of that speech.  Once again, plaintiffs have presented sufficient evidence to take this question to the jury.

The final question regarding speech retaliation is qualified immunity.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks

omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation marks omitted).

The individual defendants are not entitled to qualified immunity in this case. It is clearly established that a public employer cannot retaliate against an employee for speaking about matters of public concern as a private citizen. *Eng*, 552 F.3d at 1075. Plaintiffs' speech retaliation claims survive summary judgment.

B.    *Procedural Due Process*

To prevail on a procedural due process claim, a plaintiff must demonstrate "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (quotation marks omitted). It is undisputed that plaintiffs have a property interest in their jobs. *See Ward v. Bolek*, 2014 WL 795329, *9 (D. Or. Feb. 27, 2014) (citing Or. Rev. Stat. § 236.360). Under Oregon law, police officers are entitled to due process in connection with any "dismissal, demotion, suspension without pay, reduction in salary, written reprimand and transfer." *Id.* § 236.350. Thus, Bowers was deprived of a property interest when he was suspended and demoted, and Lichte and Kelly were deprived of a property interest when they were fired.

Plaintiffs do not assert they were given inadequate notice. Accordingly, the only question is whether plaintiffs had a meaningful opportunity to be heard. Defendants spend much of their motion explaining the multi-step process defendants went through before imposing discipline. That argument, though well-supported in the summary judgment record, misses the point. There is ample

evidence from which a jury could conclude defendants were merely enforcing internal departmental rules when plaintiffs were disciplined. However, there is also sufficient evidence to support the conclusion that defendants selectively enforced broadly worded policies to punish plaintiffs for speaking out against misconduct. If that is true, then any opportunity to be heard in the multistep disciplinary process was not meaningful as required by the Due Process Clause.

Once again, defendants are not entitled to qualified immunity. Plaintiffs' claims depend on allegations of bias and bad faith. The right to an unbiased decisionmaker is clearly established. *Stivers v. Pierce*, 71 F.3d 732, 746-47 (9th Cir. 1995) (presence of even one biased decisionmaker on multi-member tribunal violates due process). Plaintiffs' procedural due process claims survive summary judgment.

C.    *Remaining Federal Claims*

Plaintiffs also allege defendants violated their First Amendment right to free association, Fourteenth Amendment right to substantive due process, and Fourteenth Amendment right to equal protection of the laws. Defendants are entitled to summary judgment on all three claims.

Plaintiffs' free association claims cannot proceed because nothing in the summary judgment record suggests that plaintiffs suffered adverse employment action because of who they associated with. *See Hudson v. Craven*, 403 F.3d 691, 695 (9th Cir. 2005) (plaintiff alleging free association retaliation must show a causal link between protected association and adverse employment action). Plaintiffs' equal protection claims fail because there is no evidence plaintiffs are members of any protected class, and the Ninth Circuit has squarely foreclosed application of the "class-of-one" equal protection claim to the public employment context. *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 995 (9th Cir. 2007).

Page 27 - OPINION AND ORDER

Plaintiffs' substantive due process claims require a bit more discussion. In *Engquist*, the Ninth Circuit declined to adopt a blanket rule foreclosing substantive due process claims based on a public employer's violation of occupational liberty. *Id.* at 996. But the court limited such claims to "extreme cases," such as those where the public employer blacklists the plaintiff, "effectively exclud[ing] the blacklisted individual from his occupation." *Id.* at 997. Because plaintiffs have identified no evidence in the summary judgment record showing defendants did anything extreme enough to support a substantive due process claim — *i.e.*, evidence that defendants not only deprived plaintiffs of property rights in this job but also acted to restrict their ability to obtain work in their chosen profession elsewhere — summary judgment must also be entered on that claim.

D.     *Municipal Liability*

Because plaintiffs' free speech and substantive due process claims survive summary judgment, I must determine whether they can proceed with those claims against the City. Local governmental units are subject to liability for violations of constitutional rights under section 1983. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). That liability, however, is limited to holding municipalities responsible "for their *own* illegal acts[.]" *Id.* at 479 (emphasis in original). There is no vicarious liability under section 1983. *Id.* To succeed in a claim against a municipality, a plaintiff must show that the City acted according to "official policy" when it violated a constitutional right. *Id.* Liability attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. In the absence of a formal governmental policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Gilette v. Delmore*, 979

F.2d 1342, 1346 (9th Cir. 1992) (quotation marks omitted). The custom must be so "persistent and widespread" that is constitutes a "permanent and well settled" city policy. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978); *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.").

Here, there is sufficient evidence to permit the free speech and procedural due process claims to go forward against the City. The summary judgment record contains evidence from which a jury could conclude that plaintiffs were deliberately retaliated against over a period of many years for reporting or threatening to report misconduct, in violation of the First Amendment. The summary judgment record also contains evidence from which a jury could conclude the internal affairs investigative process was used in bad faith and that discipline was imposed by biased decisionmakers, in violation of the Fourteenth Amendment's guarantee of procedural due process. Because the IA investigative process and other forms of alleged retaliation were used repeatedly and over the course of many years, a jury could determine the City operated according to well-settled policy when it violated plaintiffs' First and Fourteenth Amendment rights. Defendants' motion for summary judgment on the issue of municipal liability is denied.

E.    *Punitive Damages*

For each of their section 1983 claims, plaintiffs ask for punitive damages. Punitive damages are available under section 1983 if the plaintiff proves that a defendant's conduct was "motivated by evil motive or intent, or . . . involve[d] reckless or callous indifference to the federally protected rights of others." *Ward v. City of San Jose*, 967 F.2d 280, 286 (9th Cir. 1992). "The decision to

impose such sanctions is within the exclusive province of the jury." *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 707 (9th Cir. 1989), *overruled on other grounds*, *Hunter v. Bryant*, 502 U.S. 224 (1991). There is sufficient evidence in the summary judgment record to support the conclusion that the individual defendants deliberately manipulated the Woodburn Police Department's internal disciplinary systems to retaliate against plaintiffs. That same evidence would permit a jury to find defendants acted with evil intent or with reckless indifference to plaintiffs' rights. Plaintiffs' claims for punitive damages against the individual defendants may proceed.[8]

III.    *State Claims*

In addition to asserting federal constitutional claims, plaintiffs also allege defendants violated their rights under several Oregon whistleblower statutes, specifically sections 659A.199, 659A.203, and 659A.230 of the Oregon Revised Statutes. Plaintiffs do not seek damages in connection with their state claims. Instead, they ask the court to order defendants to stop violating whistleblower laws and report facts established at trial to the Oregon Department of Public Safety Standards and Training ("DPSST"), the body that licenses Oregon police officers. Plaintiffs also ask this Court to suspend the licenses of all individual defendants to serve as police officers pending DPSST investigation.

Because Lichte and Kelly no longer work as Woodburn police officers, the injunctive relief they request cannot prevent them from being injured in the future. Lichte's and Kelly's state-law whistleblower claims are therefore dismissed for lack of subject matter jurisdiction. *See Serena v. Mock*, 547 F.3d 1051, 1054 (9th Cir. 2008) (holding that a claim must be dismissed when a court

---

[8] Municipalities are immune from punitive damages under section 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

can grant "no effective relief" on that claim). Should Lichte and Kelly wish to maintain claims under state whistleblower laws, they must seek leave to amend the complaint to request relief that meets Article III's redressability requirement.

That leaves Bowers's claims. First, Bowers's claim under section 659A.199 must be dismissed. This Court has repeatedly held that section 659A.199 does not apply to public employers. *See Nichol v. City of Springfield*, 2016 WL 3512071, *4 (D. Or. Jun. 27, 2016); *Minger v. Hood Comm. Coll. Dist.*, 2016 WL 475382, *7 (D. Or. Feb. 4, 2016). For Bowers's remaining claims, the City of Woodburn is substituted as the defendant pursuant to defendants' motion and the Oregon Tort Claims Act. *See* Or. Rev. Stat. § 30.265(1)-(3).

There is sufficient evidence in the summary judgment record to permit Bowers to proceed with his claim under section 659A.203. Section 659A.203 makes it an unlawful employment practice for any public employer to

> Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:
>
>> (A)    A violation of any federal or state law, rule or regulation by the state, agency or political subdivision; [or]
>
>> (B)    Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from    action of the state, agency or political subdivision.

Or. Rev. Stat. § 659A.203(b). Bowers's confrontation with Sergeant Wilson over the victim photos incident, which included a threat to initiate a DOJ investigation, qualifies as disclosure of information Bowers reasonably could have believed to be evidence of abuse of authority. A reasonable juror could conclude there was a causal relationship between that confrontation and the

series of disciplinary events that followed (Sergeant Wilson following Bowers around with a tape recorder, the series of internal affairs investigations, and Bowers's eventual three-day unpaid suspension and fifteen-day demotion from the detective rotation).

Bowers's claim under section 659A.203 is also timely. Oregon law imposes a one-year statute of limitations for whistleblower claims. Or. Rev. Stat. §§ 659A.875(1), (6). In addition, whistleblower claims fall under the Oregon Tort Claims Act, which requires a plaintiff to give the public body notice of an intent to file a tort claim within 180 days of when the claim accrues. *Id.* § 30.275(1)-(2). Bowers's confrontation with Wilson, including the threat to contact the state DOJ, occurred in late 2012. The internal affairs investigations against Bowers commenced in March 2013 and culminated with his suspension and demotion in October 2013. With the imposition of this adverse employment action, Bowers's whistleblowing claim accrued. Bowers filed a tort claims notice in November 2013, within 180 days of the date of accrual. And this lawsuit was filed in September 2014, within a year of the date of accrual.

There is insufficient evidence, however, for Bowers to proceed with his claim under section 659A.230. As relevant here, section 659A.230 makes it an unlawful employment practice for any employer to "discharge, demote, suspend or any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee . . . has in good faith brought a civil proceeding against an employer[.]" *Id.* § 659A.230(1). Although Bowers filed a civil proceeding against his employer, there is insufficient evidence in the summary judgment record to support the conclusion the City retaliated against him for filing this lawsuit.

As noted above, Bowers's demotion and suspension were imposed in October 2013, one

month before he gave defendants notice of his intent to file suit. Plaintiffs' timeline contains several entries stating that Bowers's schedule was changed after the tort claims notice was filed and also refers to an internal affairs investigation that supposedly resulted in a finding of "not sustained" after a new Police Chief assumed office. *See* Boiler Decl. Ex. 1 at 25-29. Those timeline entries either contain no citation to the summary judgment record or vaguely state that documentation is attached as an exhibit. This Court was unable to find support in the summary judgment record for the post-November 2013 timeline entries relating to Bowers, with the exception of three pages of Russell's deposition discussing the investigation of a complaint against Bowers. Russell Dep. 146:2-148:10. A plaintiff must do more than make allegations at this stage of the proceedings. The post-November 2013 Bowers timeline entries are the sort of "unsupported conjecture" and "conclusory statements" insufficient to defeat a motion for summary judgment. *Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). The City is entitled to summary judgment on Bowers's section 659A.230 claim.

Finally, I turn to the City's arguments regarding the requested relief. The City challenges the request for an order compelling defendants to stop violating whistleblower laws as a disfavored "obey the law" injunction. *See Perez-Perez v. Progressive Forestry Servs., Inc.*, 2000 WL 40927, *4 (D. Or. Jan. 19, 2000) ("[I]t is not appropriate for a court to grant the type of broad, prophylactic injunction sought by plaintiffs[.]"). Unlike some federal appellate courts, the Ninth Circuit has not adopted a *per se* rule against such injunctions. *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012). Like all federal courts, however, courts in the Ninth Circuit have an obligation to ensure that the language of an injunction is not vague, both because of the specificity requirements of Federal Rule of Civil Procedure 65(d)(1), *United States v. Miller*, 588 F.2d 1235, 1261 (9th Cir. 1978), and

because vague injunctions may raise due process concerns, *Stone v. Godbehere*, 894 F.2d 1131, 1133-34 (9th Cir. 1990).

I agree with the City that issuing the broad injunction requested in the complaint would raise vagueness concerns. However, that does not mean the City is entitled to summary judgment. "A district court has considerable discretion in granting injunctive relief and in tailoring its injunctive relief." *United States v. AMC Entertainment, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). If Bowers convinces the jury that it is likely the City will violate his rights under section 659A.203 in the future, the Court will consider at that time how to tailor an injunction to avoid vagueness concerns.

I agree with the City that plaintiffs' second and third requests for injunctive relief must be denied. Bowers has not explained how the second request (an order requiring the City to DPSST any facts established at trial that bear on the individual defendants' fitness to serve as police officers and request that DPSST investigate those facts) would prevent future injury to him. This is so particularly because it appears that all of the named defendants have stopped working for the Woodburn Police Department.[9] *See* Boiler Decl. Ex. 1 at 29 (stating Russell retired on November 13, 2015); *id.* at 31 (stating Hereford resigned on approximately October 7, 2016 and Alexander announced in October 2016 he was retiring December 1, 2016). Assuming that is the case, this Court lacks jurisdiction to grant the second request because it would not redress Bowers's injuries.

The third request (for an order suspending the licenses of the named defendants pending a DPSST investigation) concerns relief this Court cannot provide for a different reason. Under state law, DPSST has the authority to suspend police officers' licenses. *See* Or. Rev. Stat. § 181A.640.

---

[9] I say "appears" because these timeline entries either provide no citation to the summary judgment record or cite a part of the record that has nothing to do with retirement or resignation.

Page 34 - OPINION AND ORDER

This Court cannot order DPSST, a nonparty to this lawsuit, to suspend defendants' licenses. Fed. R. Civ. P. 65(d)(2). Although Bowers may proceed with his claim under section 659A.203, this Court cannot give him the second or third types of injunctive relief requested.

## CONCLUSION

Mikkola's amended motion for summary judgment (doc. 52) is GRANTED. The remaining defendants' motion for summary judgment (doc. 48) is GRANTED IN PART as follows:

1. Summary judgment is entered in favor of defendants on plaintiffs' federal claims regarding free association, substantive due process, and equal protection;

2. Lichte's and Kelly's state-law claims are dismissed as moot;

3. All claims against the John Doe defendants are dismissed; and

4. Summary judgment is entered in favor of defendants on Bowers's claims under Or. Rev. Stat. § 659A.199 and § 659A.230.

Defendants' motion for summary judgment is otherwise DENIED. Defendants' request for oral argument is denied as unnecessary.

IT IS SO ORDERED.

Dated this _12th_ day of ~~December~~ January 2016.

Ann Aiken
United States District Judge